Janet L. HARDEN, and James M. Harden, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 178–131.

United States District Court,
S. D. Georgia,
Augusta Division.

Feb. 11, 1980.

Thomas R. Burnside, Jr., James B. Wall, Burnside & Wall, Augusta, Ga.; for plaintiffs.

Kenneth C. Etheridge, Asst. U. S. Atty., William T. Moore, Jr., U. S. Atty., Savannah, Ga., for defendant.

## MEMORANDUM OF OPINION AND ORDER

BOWEN, District Judge.

This wrongful death action was originally brought by Mrs. Janet L. Harden who had a cause of action authorized by Ga. Code § 105–1307 against the United States of America under the provisions of Chapter 171, Title 28, United States Code. There is no dispute as to the jurisdiction of the Court or the jurisdictional facts of the case which is properly before this Court. The case presents the tragic and unnecessary death of a teenage boy by the alleged negligence of a Government employee. The non-jury trial was conducted before the Court from January 23 to January 25, 1980. Nineteen witnesses appeared at the trial and 73 documents, maps and photographs have been admitted in evidence. Two maps are appended to this opinion to aid in the complete understanding of the factual situation.

The findings of fact. made by the Court are stated in this opinion in narrative form in compliance with Rule 52(a), Federal Rules of Civil Procedure. The facts stipulated by the parties have been incorporated, to the extent necessary. The national publication of the names of the youthful witnesses and event participants would serve no positive purpose. They are not identified in the narrative.

The plaintiff, Janet L. Harden, is the mother of Wesley Clayton Harden who died on September 4, 1977. James M. Harden is the husband of Janet L. Harden and the father of Wesley Clayton Harden. Plaintiffs' son was known to his family and friends as "Clay". His death was caused by a gunshot wound.

Clay Harden was a socially and athletically active boy. He was large for his age and was of average intelligence. To his misfortune, he was well-liked and accepted by a group of older boys whom he came to know through his athletic and school activities. This group of boys, who ranged in ages from 16 to 19 years, were loosely organized into a high school "fraternity" not recognized or sanctioned by school authorities. They called themselves Omega Phi Delta. The objects of the "fraternity" include no known redeeming characteristics. The only purposes or reasons for the existence of this "fraternity" were hazing and general "hell-raising." Clay Harden was a willing and active participant in the activities of the group. After being invited to join the group, he was to be initiated along with several other boys, on September 4, 1977.

On the afternoon of September 4, 1977, the members of the "fraternity", and those to be initiated, traveled by several automobiles from Augusta, Georgia, to Pollard's Corner in Columbia County, Georgia, which is located very near the Clark Hill Dam on the Savannah River. After meeting at Pollard's Corner, the group then traveled to the Ridge Road Campsite area, also in Columbia County, Georgia. The entire Ridge Road Campsite area is located on property owned and controlled by the United States of America known as the Clark Hill Reservoir Management Area.

When the group arrived at the Ridge Road Campsite Area well before dark, it was raining. It was Labor Day Weekend and the campsite area was crowded. There was one remaining campsite, that being No. 12. After driving around in the Ridge Road area, they decided to use Campsite 12 as the base for their hazing and initiation activities. The boys had several vehicles, including a van and a small pickup truck.

After arriving at the campsite, a United States Army Corps of Engineers "fee ranger" arrived and collected four dollars ($4.00) from the boys for the use of the campsite. How much sorrow could have been averted by this ranger's aggressive inquiry into the purposes of this relatively large group of boys would be mere speculation. But, such speculation is unavoidable in light of the fact that the contingent of rangers at Clark Hill is understaffed, and, in some cases, inadequately trained.

While it was raining, the entire group gathered in the van and drank beer from a keg which they had brought with them. Clay Harden drank some beer but was not intoxicated at the time of the incident which resulted in his death. Clay was in good health. He was unable to walk without limping, or to run, because he was recovering from surgery to his knee.

When the rain stopped, it was still cloudy and was almost dark. Columbia County is in the eastern daylight time zone, and full darkness does not occur at that time of year until about 9:00 p.m. The cloudy conditions accelerated the onset of darkness.

The boys got out of the van. Those to be initiated in the "fraternity" stripped naked and were liberally doused with raw eggs, flour, catsup, hot sauce, dirt, and other substances. Their nakedness was thus rendered revolting.

Campsite 12 lies along the Ridge Road. It is marked on the appended Exhibit "A." Exhibit "B" shows the entire peninsula area of the Ridge Road Campsite Area. Ridge Road continues down to a point of land in the reservoir where there is a loop in the

road and other campsites. It is approximately 950 feet from Campsite 12 to the campsites at the end of Ridge Road. About 150 feet west of the driveway into Campsite 12, there is a road which is generally perpendicular to Ridge Road. This road is called the "Island Road." The Island Road crosses a bridge and goes to a small island in the reservoir which is part of the Ridge Road Campsite Area. The island contains several campsites which are spread around a loop in the road. These places are also shown on the appended exhibits. It is approximately 450 feet from the intersection of Ridge Road and the Island Road to the bridge.

Part of the initiation rite of this "fraternity" was to "streak." That is, the initiate had to run in his naked and degraded condition through other campsites occupied by weekend campers. As would be expected, the campers and their families who occupied the other campsites in the Ridge Road area were mature, law abiding, quiet, decent people bent on nothing more or less than clean, wholesome, outdoor, family recreation.

Just at dark, a loathsome, fearsome procession began. The initiates, wearing only the mixed ingredient slime applied by their tormentor friends, were herded east on Ridge Road toward the occupied campsites. They were followed closely by the senior members of the "fraternity" who were clothed, some of whom walked or ran, and some of whom rode in or upon the pickup truck. The lights on the truck were not used. The group proceeded at a walking pace and there was much noise and shouting of profanity. This procession went along the road, through the woods at times, and was disorganized, rowdy, and boisterous. Some of the boys rode on the hood of the truck, some jumped in and out of the truck, and some of the naked initiates walked and ran near or through the family campsites.

Other campers, particularly the women, were justifiably terrified. Two men who were at their boat near the water's edge heard "the commotion" and returned to their campsite. There the men found their wives crouching behind the camper in which they had locked their children for protection. Other campsites were similarly terrorized. Shots were fired from an unknown direction. The boys scattered. Some ran and some rode in the truck. They all went back up the Ridge Road in the direction of Campsite 12.

At this point, someone drove out of a neighboring campsite near the point in search of assistance. The identity of this person is unknown. He drove up the Ridge Road from the point, past Campsite 12 and the entrance to the Island Road, and, by chance, found a ranger employee of the United States Army Corps of Engineers. He said the ranger should get down to the campsite area on the point, and that there was about to be "a head-knocking contest" down there. The ranger, who had been patrolling a side road, immediately drove down the Ridge Road to the point.

The ranger who responded to the call was a "fee ranger" employed by the Corps. His name is Paul Strang, and is a man of no mean experience or background. He has served several tours in the United States Army in grades ranging from "buck private" to lieutenant colonel. He is a former minister, has several degrees, and has been a schoolteacher in the Richmond County, Georgia, system for six years. Paul Strang was hired as a "fee ranger" (GS–5), by the Corps on a seasonal basis. He worked during the peak recreational season. He was employed by the Corps during the summers of 1975, 1976, and 1977.

The duties of a "fee ranger" are set out in the job description admitted in evidence. Particular reference is made to the job description. Some of its major duties are to collect fees, issue permits, provide information to visitors and campers, and to perform surveillance and maintenance checks. The "fee ranger" has no authority to issue actual summons to violators of laws and regulations. However, "fee rangers" do issue warning citations to violators, are expected to enforce Corps regulations to the extent possible, and to maintain order in the recreation areas.

Mr. Strang had little formal training at his job, but he did have three summers' experience. He received an orientation briefing from the assistant resource manager and had some on-the-job training with another experienced "fee ranger." The "fee rangers" receive no instruction in law enforcement. No ranger is permitted to carry or use any weapon in the citation enforcement program. The "fee ranger" from whom Mr. Paul Strang received his on-the-job training, and at least three other rangers, kept firearms with them while on duty. Their firearms were not carried in a visible or noticeable way, but in brief cases which would remain in their vehicles on the front seat or some other convenient location. There was insufficient evidence to make a finding whether the supervisors of the "fee rangers" had knowledge of the use of firearms.

The weapon kept by Mr. Strang in his brief case during the performance of his duties was a .38 special caliber Smith & Wesson revolver—the kind used by many law enforcement agencies. Mr. Strang had had plenty of training in the use of firearms during his Army career, and was very familiar with the use, features, characteristics, and operation of his revolver. It was in good working condition and was operating as it was designed to do.

To assist in the performance of his duties as "fee ranger," Mr. Strang was assigned the use of a Corps vehicle. It was a dark-colored pickup truck which had an identifying decal on the door of each side. In addition to the truck, Mr. Strang was issued a flashlight and a five-watt, hand held, portable radio transceiver. The flashlight was in good working condition. The truck was in poor condition. The radio would operate as it was designed to, but it would reach only the headquarters or other rangers tuned to the same frequency. Also, it had a very limited range. Under ideal conditions, it could reach about seven miles. The mobile radios used by the permanent rangers and the headquarters' base unit can reach any point in the Clark Hill Recreation Area.

The reservoir created by the Clark Hill Dam on the Savannah River is typical of power dam reservoirs in the Piedmont Area of the Southeast United States. The lake is very deep, the area is covered by pine woods; many areas such as the Ridge Road Campsite Area are remote. At night the roads and byways are very lonely. The Clark Hill Recreation Area is quite large and is depicted on a map which is in evidence as Exhibit P–10.

Mr. Strang had reported the problems he had had with his pickup truck. It was a surplus truck, soon to be retired. The maintenance staff could not, or would not, correct its defects. The truck frequently stalled and was not dependable, particularly at low speeds.

His official duties required Mr. Strang to collect and carry with him undetermined amounts of money. These would be turned in at the end of his shifts. He frequently worked night shifts in remote areas which he described as "spooky." His primary purpose for carrying the revolver was self defense. His stated purpose in the performance of his job was to help people have a good time while at the Clark Hill Reservoir Management Area. He was also to patrol his assigned areas, maintain surveillance, and maintain order. In responding to the call for assistance in the Ridge Road Campground Area, Mr. Strang was, and intended to be, within the scope of his employment, carrying out his official duties. The job description provides in part: ". . . due to isolated locations of recreation areas, [fee rangers] must use considerable initiative, tact, and judgment in determining appropriate actions on a variety of problems incident to public use without immediate recourse to a supervisor." It is only reasonable to assume that a man, working alone in the remote clay hills and pine woods of rural Georgia, collecting fees and carrying money, in a quasi law enforcement position, would have a firearm in his possession. The uniform worn by Mr. Strang did not differ markedly from that worn by permanent personnel. The truck was clearly marked as a "ranger" vehicle and that word

is not uncommonly associated with law enforcement.

Mr. Strang did not call the headquarters by radio and request assistance. He went to the campground at the point of Ridge Road to investigate. He did this immediately.

When he arrived at the point, he was met by a group of campers: men, women and children. They were excited and agitated. Some were armed. Several people talking at the same time tried to tell him what had happened. By questioning the campers, Mr. Strang heard the story of the procession through the campsites and along the road. He heard that the boys were naked and that some were traveling in a small pickup truck. He had seen none of the boys nor the pickup truck. He didn't know the ages of the boys. Again, he did not use his radio, but decided to investigate further. He removed his revolver and its holster from his brief case on the front seat of the truck, and strapped it on his belt. He made a remark to the campers in words to the effect that he "didn't like to carry these things, but you never know what may happen." He then drove away in his truck, up the Ridge Road from whence he had come.

Now, after the first shots of unknown origin were fired and the boys had scattered in the direction of Campsite 12, they moved generally west. Some went through the woods and some went along the road but all went toward the Island Road. Proceeding down and along the Island Road across the bridge, shouting obscenities, they terrorized the campers on the island. They left the island by way of the bridge and some washed themselves in the shallow water by the bridge. The group then made a disorderly and somewhat quieter retreat away from the bridge and back toward Campsite 12. A truck arrived on the Island Road from the direction of Ridge Road near the intersection of a dirt side road which intersects the Island Road at a point approximately halfway between the bridge and Ridge Road. The occupant of this panel truck is unknown. He fired at least one shot and had a conversation with the oldest of the boys. Paul Strang heard this shot. The group was then returning to Campsite 12 through the woods and along the Island Road. The small pickup truck used by the boys had already been parked by its driver near the entrance to Campsite 12. Although it was not specifically articulated, it was the general sense or impression among the boys that their initiation rites were then over. They intended to go back to the van and have a party.

They had told some of their girlfriends that they were going to have a party. Several girls arrived in a car about that time. The girls had first turned down the Island Road and had seen the procession there. One of the boys who was clothed got into the car with them, backed it out of the Island Road to Ridge Road, and parked the car at a point on the Ridge Road below, or to the east of, the entrance to Campsite 12. The lights of the car were turned off.

Soon after the girls parked, Mr. Strang was driving his truck slowly up the short distance from the point where he had questioned the campers. He pulled up beside the girls' car and, seeing them, inquired if there was any trouble. He was told there was no trouble and he began to drive away, slowly continuing up Ridge Road past the entrance to Campsite 12. As he pulled away from the parked car, driving slowly, in the beam of his headlights Mr. Strang saw two naked boys crossing Ridge Road near its intersection with the Island Road. They then walked toward him, angling in an easterly direction. He continued forward in his truck. He had removed his pistol from its holster. As he came closer to the two boys, he looked to his right and saw several other naked males emerging from the woods on his right. The two boys on his left had moved from the beam of his headlights and they were now directly to the side of his truck, only a few yards away.

Mr. Strang was excited and fearful. There were two naked males on his left and an unknown number on his right. He did not know the age or the purpose of these persons. Again, he did not use his radio. He decided that some drastic action must be

taken to gain their attention and to restore order in the campground. Holding his flashlight in his left hand, casting the beam on the two boys to his left, and taking his revolver in his right hand, he let go of the steering wheel while driving slowly. He cocked the revolver as he thrust it out the window. He called to the boys on his left and received no response. One of the boys told the other to keep walking. Very quickly, Mr. Strang decided to fire a warning shot in the air. He was holding the pistol almost straight up. The truck stalled. His body lurched forward as the truck came to a stop. His right hand, holding the cocked revolver, came in contact with the large rearview mirror. His right elbow slipped from the window ledge. The revolver was cocked and Strang's finger was on the trigger. The contact with the mirror, the deceleration of the truck, the movement of his body, and his nervousness combined to inadvertently discharge the revolver.

When the shot was fired, both of the naked boys on his left fell to the ground. One fell from fear, the other of a mortal wound. Clay Harden, 15 years of age, lay dying on the pinestraw, gravel, and mud just off the south shoulder of Ridge Road. He was covered with the slime of his initiation into the "fraternity". The .38 caliber bullet fired from Mr. Strang's revolver had entered the left lateral aspect of Clay's left arm and passed completely through the soft tissue biceps area. It then entered the left chest. It penetrated the lower lobe of his left lung and then traversed the spinal canal. It then entered his right chest from which it exited, lodging just beneath the skin on his right side. The cause of his mercifully quick death was a massive, bilateral hemothorax, the direct result of the gunshot wound.

It was only after the shooting that Mr. Strang used his radio. He was successful in reaching another ranger who summoned an ambulance and the Columbia County Sheriff's deputies.

Mr. Strang failed to exercise ordinary care and diligence when he abandoned the steering wheel of his vehicle while it was in forward motion. Mr. Strang failed to exercise ordinary care and diligence in thrusting the loaded, cocked revolver from the window of his moving vehicle. He failed to exercise ordinary care and diligence in his attempt to shoot a "warning shot" from a moving vehicle. Mr. Strang failed to exercise ordinary care and diligence in attempting to quell this disturbance knowing that he had no law enforcement training, that shots had been fired, and that numerous persons were causing the disturbance. Mr. Strang failed to exercise ordinary care and diligence in placing the loaded, cocked revolver in close proximity to the rearview mirror of the moving vehicle, knowing as he did that the truck was not dependable at low speeds. The revolver carried by Mr. Strang is an inherently dangerous instrument when loaded, and is rendered more so in a cocked condition.

In violation of a clear duty to the public, the United States Army Corps of Engineers failed to exercise ordinary care and diligence in its operations at Clark Hill in that it provided little or no formal training to Mr. Strang as to the proper exercise of his duties as a "fee ranger." The Corps failed to exercise ordinary care and diligence in that it provided Mr. Strang with an undependable, unpredictable vehicle. It may not have seen foreseeable by Corps maintenance personnel that the proclivity of the truck to stall could cause a gunshot, but it was foreseeable that an improperly or inadequately maintained truck could cause damage to the person or property of others. The Court makes no finding as to whether permanent rangers employed by the Corps of Engineers were properly trained nor any as to the adequacy of other equipment, including radios, issued by the Corps to rangers. The agent and employee of the Corps of Engineers, Paul Strang, failed to exercise ordinary care and diligence in failing to contact his headquarters or supervisor after hearing gunshots and after receiving reports of the disturbance of the peace described to him by the campers at the point of Ridge Road. Ranger Strang owed a duty to exercise ordinary care and diligence to the public, including Clay Harden.

From the time that he received the report of trouble at the point of Ridge Road to, and including, the time the shot was inadvertently fired, Mr. Paul Strang was on duty as an employee of the United States Army Corps of Engineers. He was working in his assigned area as a park technician or "fee ranger." At such times, Mr. Strang was acting within the scope of his employment and intended to act within the scope of his employment. At such times, Mr. Strang considered himself to be acting, and was acting, in the furtherance of the business of his employer. He was a uniformed Government employee, acting on Government business, required by his job description to use considerable initiative, tact, and judgment. The shooting occurred after dark at approximately 9:30 o'clock p. m.

Wesley Clayton Harden also failed to exercise ordinary care or diligence. First, he did not heed the command of Ranger Paul Strang when Strang directed him to halt. At that time, Strang was in uniform, in a marked vehicle, and had all of the visual appearances of a duly authorized law enforcement officer. Second, he willingly and actively participated in an indecent public exposure of himself, a disturbance of the peace, and a sequence of events which he knew, or should have known, would cause fear, excitement, and resentment among other persons lawfully within the Ridge Road Campsite Area. Third, Harden accompanied others whom he knew to be engaged in illegal and opprobrious activities. He knew that shots had been fired during their activities. He knew or should have known that exposure, offensive language, and the conduct of the group would cause fear, excitement, resentment, and possibly irrational defensive measures from other persons lawfully in the Ridge Road Campsite Area. Harden owed a duty to the public, and to other users of the campsite area, to refrain from illegal, criminal,[1] opprobrious, or indecent behavior.

Wesley Clayton Harden was born on July 11, 1962. He had no wife nor children. He was an active motorcycle racer and participant in sports, notably baseball and football. He had received several trophies and awards. He did not do well in school but he was passing. He did well in mechanical pursuits. When he was only 14, he could dismantle, rebuild, and reassemble his motorcycle. He had worked sporadically for his father in his automobile parts business and would probably enter that business when he finished school. It is unlikely that Clay would enter or graduate from college. Had he lived, he would probably finish high school. Various mortality tables had been reviewed and the matter of his life expectancy has been carefully considered by the Court. At the time of his death, his life expectancy was 45 years.

At the time of the shooting, Clay Harden had not overindulged in alcohol nor had he consumed any amphetamines, barbituates, cocaine, opiates, methadone, or proposyphene (Darvon) on that day.

Clay was an active boy. He graduated from the ninth grade at Sego Junior High School in June of 1977. He had just begun the tenth grade at Butler High School. He was athletically inclined and capable. Clay could read some music, and had some skill as a musician. He was able to play several musical instruments with undetermined skill.

Clay was well-liked by his friends and much loved by his family which consisted of his father, James M. Harden, his mother, Mrs. Janet L. Harden, his sister, Gail, and his brother, Gary.

If he had lived and finished high school, Clay could have earned about $12,500.00 per year. Later, he may have earned more because his father is a successful man who manages a family owned and operated busi-

---

1. Clay Harden may well have committed an offense punishable under the Criminal Code of Georgia. His conduct may have amounted to simple assault under § 26–1301, Public Indecency under § 26–2011, a Public Disturbance under § 26–2605, or an Unlawful Assembly under § 26–2604. No finding or conclusion can be made in definite terms as to that conduct because (a) he is dead, and (b) the standard of proof of a criminal offense is different from that used in this civil action.

ness. There was room for Clay to be employed in the family business and he may have become a valued employee. Given time, he may have become a management employee of the business.

No one can place an accurate value on the life of Clay Harden. Mere dollars will never compensate his family for their loss. The worldly circumstances of the Harden family are quite comfortable. But that is not to say that his death would not result in some pecuniary loss. This District Judge has struggled through many hours and many figures in an attempt to determine the full value of the life of the decedent contemplated by the Georgia Wrongful Death Statute, in terms of loss to the plaintiff.

Under the circumstances of this case, and these facts found by the Court, no inflation, "wage increase," fringe benefits, or "productivity" factors should be included in determining projected future earnings of Wesley Clayton Harden. His projected future earnings, after graduation from high school at age 18, should be calculated at the rate of $12,500.00 per year for 42 years, or $525,000.00. The discount rate by which any sum awarded by the Court should be reduced to a present value is nine per cent (9%). To obtain the present value of a 42-year working lifetime with an earning capacity of $12,500.00 per year, at a 9% discount rate, the sum of $12,500.00 per year should be multiplied by a factor of 10.813366. Thus, the present value of such earning capacity is $135,167.07.

Upon the foregoing findings of fact made by the Court at the trial, the following conclusions of law are applied.

## I. LIABILITY

■ The grounds for the liability of the United States for court claims are clearly stated in 28 U.S.C. § 2674. As frequently quoted, the Government is liable ". . . in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment *or for punitive damages.*" There is a substantial question in this case regarding the nature of the damages to be awarded under the Georgia Wrongful Death Statute.[2] This is not a dilemma. Where, as in Georgia, damages for wrongful death have been construed to be punitive in nature, the United States is liable only ". . . . for actual or compensatory damages, measured by the pecuniary injuries resulting . . . to the persons respectively, for whose benefit the action was brought . . ." 28 U.S.C. § 2674. The pecuniary injury resulting to the plaintiffs, and the amount of damages to be awarded for the loss of Clay's life, will be separately discussed hereinafter.

All of the events relating to the death of Wesley Clayton Harden occurred in Georgia, his parents are residents of the State of Georgia, and there is no question that the laws of Georgia relating to wrongful death and negligence apply here.

In Georgia, negligence is defined generally as the absence of the exercise of ordinary diligence.[3]

■ Both Ranger Paul Strang and the United States Army Corps of Engineers failed to exercise ordinary care and diligence in matters in which they owed to the public and Clay Harden a duty to exercise such ordinary care and diligence. If the defendant is to be liable for the death of Clay Harden, his injury must be the direct and proximate effect or result of the negligence of Strang or the Corps. The plaintiff has shown that the mortal injury suffered by Harden was directly and proximately caused by Strang's negligent act and the Corps' failure to properly maintain its vehi-

---

**2.** See Ga.Code § 105–1301, *et seq.* For a further discussion of the Georgia Wrongful Death Statutes, see section III of this opinion.

**3.** Ga.Code Ann. § 105–201 provides: "In general, ordinary diligence is that degree of care which is exercised by ordinarily prudent persons under the same or similar circumstances. Applied to preservation of property, ordinary diligence means that care which every prudent man takes of his own property of a similar nature. The absence of such diligence is termed ordinary negligence."

cle. The erratic movement of the truck coupled with Strang's extremely imprudent handling of the vehicle and a loaded, cocked, powerful revolver should easily have been foreseen by anyone exercising ordinary care or diligence to be likely to cause injury to persons or property. It is true that one confronted with a sudden emergency, without sufficient time to determine accurately and with certainty the best thing to be done, is not held to the same standards of judgment as would be required if more time for deliberation existed. The requirement of the law upon such a person remains as ordinary diligence under all the facts and circumstances of the situation. *Savannah Electric and Power Co. v. Russo*, 71 Ga.App. 397, 31 S.E.2d 87 (1944); *Clackler v. Barnwell*, 83 Ga.App. 515, 64 S.E.2d 384 (1951).

█ The sudden emergency with which Ranger Strang was presented does nothing to lessen his duty to use ordinary care. The loaded revolver he carried is a dangerous instrument. It was rendered even more so by being cocked and held out of the window of a moving vehicle. One is under a legal duty to use a dangerous instrument with a decree of care in proportion to the danger of the instrument. 57 Am.Jur.2d § 108; *Lee v. Georgia Forest Products Co.*, 44 Ga. App. 850, 163 S.E. 267 (1932). Ranger Strang failed to exercise even minimal care or diligence, even in the emergency situation that he thought existed, while holding in his hand a most dangerous weapon. The failure of the United States Army Corps of Engineers to properly maintain its vehicle, a fault less serious than the negligent use of the firearm, was nevertheless a substantial contributing factor to this tragedy.

Ranger Paul Strang was employed by the United States Army Corps of Engineers on September 4, 1977. He was conducting his assigned duties when the death of Clay Harden occurred. He was authorized and required by his job description to use judgment and initiative. While he may have utilized some initiative, his judgment failed.

█ Ranger Strang's possession or use of a weapon on the night Clay Harden was killed was prohibited by regulation and forbidden by his superiors. The defendant's exposure however, does not end with the conclusion that Strang's superiors acted reasonably in that regard. The Government must also answer for the negligence of Strang himself. "In Georgia, as in most jurisdictions, the mere fact that a servant's negligent act is expressly forbidden by the master does not absolve the master of vicarious liability. The test is whether the servant's negligent act is within the class of acts that the servant is authorized to perform. 'If the act is within the class, the master is bound, although the servant is forbidden to perform the particular act.'" *Williams v. United States*, 352 F.2d 477 at 480 (5 Cir. 1965), *Evans v. Caldwell*, 52 Ga.App. 475, 184 S.E. 440 (1936), aff'd. 184 Ga. 203, 190 S.E. 582 (1937).

"Another formulation of the test applied by Georgia courts is that a master will be liable for injury to third persons caused by a servant's negligent act done in furtherance of the master's business—that is, while the servant is engaged in serving the master." *Williams v. United States*, 352 F.2d. 477, at 480 (1965); *Georgia Power Co. v. Shipp*, 195 Ga. 446, 24 S.E.2d 764 (1943). There was uncontroverted testimony that Strang was about his master's business at the time of the shooting. Likewise, the evidence clearly demonstrates that Strang was employed to maintain "surveillance", to exercise his own judgment, to maintain order, and (he thought) to keep the peace. His employer should have known of the proclivity of Strang and other "fee rangers" to carry firearms.

Ranger Strang was not on a frolic of his own, whether prohibited or allowed, when he negligently shot Clay Harden. His departure from the prescribed course for "fee rangers" was negligence in itself. If Strang's superior officers had authorized his negligent act, the doctrine of respondeat superior would be irrelevant. In short, since the Government had authorized Strang to exercise his judgment and permitted him to act as a uniformed officer, with all of the outward appearance of a law

enforcement officer, and since the Government through its other employees knew, or should have known, of his proclivity to carry weapons in the line of duty, the Government must respond and answer for his careless mishandling of the weapon. Moreover, since a contributing fact to the death of Clay Harden was the malfunction of Strang's vehicle, the Government must also respond and answer for its direct negligence, independently of that of its servant Strang.

■ In Georgia law, foreseeability is talismanic for purposes of determining whether there has been a breach of duty of care. It is foreseeable that an improperly maintained malfunctioning pickup truck may cause injury to the person or property of another. Nothing could be more foreseeable than the probability of harm to another caused by holding a loaded, cocked revolver from the window of a moving vehicle which was known to have a tendency to stall at low speeds. Both Ranger Strang and the Government owed to the public, even to those engaged in activities which could amount to misdemeanors under Georgia law, a standard of ordinary care and diligence. The standard was not met, harm was foreseeable, Strang was negligent, the Government was negligent, and the defendant is liable for the wrongful death of Wesley Clayton Harden.

■ I have concluded that the defendant is liable for the death of Clay Harden. However, Clay Harden also was negligent. He failed to exercise ordinary care and diligence in several ways. He, too, owed a duty to the public and other users of the Ridge Road campsites. It is true that he was only walking along the side of the road when he was shot. Nevertheless, he had failed to heed the command to halt given by Ranger Strang who had all outward appearances of a law enforcement officer. Instead of heeding the command to halt, he followed the instructions of his friend who told him to "keep walking". He was quietly returning along the side of the road from an illegal adventure with his friends. Through their offensive conduct, they had

placed others reasonably in fear of harm to themselves and their families. The boys, including Clay Harden, had created the very atmosphere of fear, excitement, resentment, and emergency which led Ranger Strang to strap on his revolver in his misguided efforts to maintain order and protect the public. Clay Harden failed to exercise the ordinary care and diligence in his conduct and actions which he owed to the public in general and to the occupants of other campsites. While his participation in the offensive activities was not ongoing at the instant in which he was shot, they appear to me to have a sufficient causal relationship to the shooting to be a contributing proximate cause to his death.

■ Ga.Code, § 105–204 imposes on a child of "tender years" the duty to exercise "such care as its capacity, mental and physical, fits it for exercising in the actual circumstances of the occasion . . ." Georgia Courts have consistently held that the question of whether a child *under 14* is capable of negligence "except in plain and unmistakable cases is a question for determination by the jury". *Rogers v. McKinley*, 48 Ga.App. 262, 172 S.E. 662 (1934). Clay Harden was 15 years of age, mentally competent, and physically mature beyond his years. I conclude that he was capable of negligence, and that he was negligent.

Georgia courts permit the comparison of the negligence of the injured party to that of the tort feasor. If the Government is liable to the plaintiff for the wrongful death of Clay Harden, and if some negligence on the part of Harden contributed to this injury, so long as Harden's negligence was less than that of the Government or its servant, Harden's negligence would not prevent a recovery for his wrongful death. The amount of any damages which otherwise would be awarded must be reduced in proportion to · the negligence of Harden compared with that of the Government and its employee. *McDowall Transport Inc. v. Gault*, 80 Ga.App. 445, 56 S.E.2d 161 (1949). Accordingly, I conclude that the comparative negligence of Clay Harden must reduce the amount of any award of damages in

this case. The actual comparison of negligence will be specifically made in Section II hereof.

## II. DAMAGES

In wrongful death cases in Georgia, the measure of damages is statutory.[4] I have the unpleasant but necessary duty to determine the full value of the life of Clay Harden. No other standard for such a determination exists, so it must be expressed in dollars. The plaintiff and defendant presented the testimony of three economists in an effort to provide a factual basis for the valuation. Their testimony was most helpful. Their testimony presented a broad range of opinion and several differing methods of calculation of the value of a life by the prospective future earnings capacity of the deceased.

In awarding damages in this case, other factors must also be considered. The comparative negligence of Clay Harden is an important one. Also, damages of a compensatory and punitive nature must be distinguished. This youth had no earnings history nor any particular expressed ambitions. Who is to say what he would have done had he lived? Unfortunately, I am.

In 1905, the Supreme Court of Georgia commented upon this state's wrongful death statute. "The statute is, however, one that is intended to *inflict a punishment* upon wrong-doers who bring about the death of a human being by negligence. Lord Campbell's act and the various statutes in this country based upon it are nothing more than *a method of punishing* negligence by civil action  .   .   . This is nothing more nor less than a legislative imposition of a penalty upon the person who causes the death of another by negligence, the penalty to go to the person injured. *While such legislation is punitive* so far as the defendant is concerned, it is compensatory so far as the plaintiff is concerned; but exact compensation for the loss sustained is not the primary object of the statute, though in many cases this result may be brought about." *Savannah Electric Co. v. Bell*, 124 Ga. 663 at 668, 669, 53 S.E. 109 at 112 (1905) [emphasis added].

The federal statute 28 U.S.C. § 2674 requires that punitive damages and compensatory damages be distinguished. Additionally, compensatory damages are to be limited to, and  ".   .   . measured by the pecuniary injuries  .   .   . to the persons  .   .   . for whose benefit the action was brought  .   .   ." The Fifth Circuit Court of Appeals has addressed this issue directly in *Hartz v. United States*, 415 F.2d 259 (1969). ."Is the figure representing the full value of [the decedent's] life to be reduced by a figure representing an estimate of the part that he would have expended on his personal needs and purposes, or, in other words, was [plaintiff] *to be limited to the amount of her financial loss.*" 415 F.2d at 264 [emphasis added]. In answer to this question, the Court stated "[t]his Court has heretofore recognized, relative to the Georgia statute, that to the extent it permits recovery of more than the loss to the survivor *it is punitive*  .   .   . The Georgia Supreme Court has likewise characterized the statute  .   .   . We conclude that, *guided by the language of the Tort Claims Act*, the trial court may well have given consideration to the available standard of living of the decedent .   . and made a substantial allowance for personal expenses  .   .   . in fixing the final amount. We conclude that the *federal statute requires that the trial court do so* .   . " 415 F.2d at 264 [emphasis added]. Also see *United States v. Becker*, 378 F.2d 319 (9 Cir. 1967). Thus, the District Court is bound to consider all factors which would have a bearing on *the actual loss suffered by the survivors* as a result of Clay Harden's death. He was not married, he had no children, and he had no job. The cause of action lies in the parents. While children often do contribute to the support and maintenance of their parents, it usually oc-

4.   Ga.Code Ann. § 105–1308 provides: "The full value of the life of the decedent, as shown by the evidence, is the full value of the life of the decedent without deduction for necessary or other personal expenses of the decedent had he lived."

curs at a later age. It would rarely occur when the child was 15 years old.

Throughout his life, no matter how much money he earned, Clay Harden, like the rest of us, would have to pay for his food, his clothing, his housing, the necessities of his family, and his taxes to the sovereign. These payments, which he would undoubtedly make, could amount to a very large portion of his income. What a parent would be entitled to as a pecuniary loss by way of the death of a youthful child could only be determined by the enlightened conscience of a jury, or in this case, the District Judge. To the extent that any portion of the value of the life of Clay Harden represents damages against the United States which are punitive in nature, no such award will be made. Damages will be awarded only to the extent that their sum represents a loss which is *pecuniary and compensatory*.

■ The testimony by the economists as to the value of the life of Clay Harden is conflicting. Estimates of his projected future earnings and probable fringe benefit entitlements, compounded by varying "wage increase" and inflation rates, vary in the hundreds of thousands of dollars. As trier of the facts, this Court is not bound to accept the conclusions of expert witnesses even when they are undisputed. *Bradshaw v. United States*, 143 U.S.App.D.C. 344, at 356–57, 443 F.2d 759 at 771–72 (1971). When approaching similar testimony in another case, Judge Lawrence said it all in a very few words.[5]

I have considered all of the economists' testimony. I have reviewed their projections. Each case must be considered in the most subjective manner. I have great concern about accepting a mortality table life expectancy of a youth 15 years of age who demonstrated extremely poor judgment in the circumstances which led to his death, and whose recreations included motorcycle racing. These concerns have resulted in the

factual finding and the conclusion of law that his life expectancy, at the time of his death, was 45 years. Careful examination of the school records, the boy's interest, and the testimony in the case require the finding and conclusion that, if he had lived, Clay Harden would go to work after finishing high school at age 18. This leaves a 42-year life expectancy in which he would be gainfully employed.

■ Under the facts of this case, and in light of the law prohibiting the award of any punitive damages (or damages in excess of the pecuniary loss to the survivors) no conclusion that any fringe benefits, "wage increase" factors, inflation factors, productivity factors, will be drawn in this case. There is no history of earnings. The type of job that the boy may have had, whether he would follow in his father's business footsteps, and other questions relating to his financial future can be supplied only by imagination. These factors, which would add to or compound the projected future earnings of Clay Harden, are too speculative to be included in any award made in this case.

■ In Section I of this opinion, I concluded that the damage award should be reduced in some amount by the comparison of the negligence of Clay Harden to that of Paul Strang and the United States Army Corps of Engineers. There is no formula or percentage upon which this comparison can be based. Such a comparison or ratio must be developed in the enlightened conscience of the trier of fact. After a thorough review of the trial notes, the testimony, the exhibits, and a draft of this opinion, a conclusion, mixed of fact and law, has been drawn on proportionate, or comparative, negligence. I find and conclude that Clay Harden's negligence was 25% of the proximate cause of his own fatal injury. The

---

5. The late Honorable Alexander A. Lawrence, then Chief Judge in this district, stated in *Aretz v. United States*, D.C., 456 F.Supp. 397 at 410, "I respect and have considered such evidence in this case. Generally, however, expert testi- mony must be taken *cum grano salis* when it involves predictions as to what will happen in a person's economic future . . . It is apt to be governed more by theory than the practicalities of the particular situation."

negligence of Ranger Strang and the United States Army Corps of Engineers was 75% of the direct and proximate cause of Clay Harden's death.

■■■ Likewise, there are few tangible indicators of the actual pecuniary loss occasioned by his death to Clay's parents. That fact also must emanate from the enlightened conscience of the trier of fact. I find and conclude that the actual pecuniary loss to the parents is two-thirds of the full value of the life of the decedent less the amount attributable to comparative negligence of the deceased after reduction of the "full value" amount to present worth. The other one-third is punitive, noncompensatory, and prohibited by 28 U.S.C. § 2674. The proper discount rate for a reduction to present worth is equal to nine per cent (9%).

The last paragraph of the findings of fact provides the basis for the computation of the projected future earnings during Clay Harden's life expectancy. Drawing on these findings, and all of the evidence adduced at the trial, bearing in mind the law and conclusions heretofore made, I have computed the damage award in this case. In narrative form, the annual projected future earnings of Clay Harden, at the rate of $12,500.00 per year have been multiplied by his working life expectancy of 42 years. Gross projected future earnings are $525,000.00. These gross projected future earnings have been reduced by the formula suggested by an economist witness to arrive at a present worth, considering a nine per cent (9%) discount rate, i. e. by multiplication of the factor 10.813366 times the sum of $12,500.00. The present worth of the gross projected future earnings amount of $525,000.00 is therefore $135,167.07. The amount attributed to the comparative negligence of Wesley Clayton Harden is 25% of the present worth figure aforementioned, or $33,791.77. After reduction of the present worth figure by the comparative negligence figure, the subtotal result is $101,375.30. The facts and the law require this District Judge to find and conclude

that any damages in excess of two-thirds (⅔) of the subtotal figure aforementioned are punitive and noncompensatory to the survivors. Accordingly, the total damages award is in the sum of $67,586.91. A numerical computation of this award follows:

| | | |
|---|---|---|
| a. | Annual projected future earnings | $ 12,500.00 |
| b. | multiplied by life expectancy after work begins [42 years] | x  42 |
| | | $525,000.00 |
| c. | equals gross earnings | |
| d. | reduced by formula to present worth [9%] | 135,167.07 |
| e. | less: amount attributable to the comparative negligence of the deceased [25% of "d"] | − 33,791.77 |
| | Subtotal | $101,375.30 |
| f. | less: amount concluded by the Court to be non-compensatory and punitive, thus prohibited by 28 U.S.C. § 2674 [33⅓% of "e"] | − 33,788.39 |
| | Total damages AWARD | $ 67,586.91 |

While I have not given effect to any inflation factor, and the probable depreciation in the value of the dollar, this evidence has been considered. Georgia Courts permit the consideration of evidence as to inflationary trends, and the probable effect of inflation on the projected future earnings of children. *Woods v. Andersen*, 145 Ga. App. 492, 243 S.E.2d 748 (1978). Such evidence notwithstanding, the award of damages is fairly compensatory for the actual pecuniary loss suffered by the survivors of the deceased.

## III. GEORGIA WRONGFUL DEATH STATUTES

At the time of Clay Harden's death and the time of the filing of this suit, the statutory law on wrongful death was codified in Title 105 of the Ga.Code Ann., §§ 1301–1310. An interesting development in the

Wrongful Death Statutes of Georgia has occurred and is of importance in this case. Ga.Code § 105–1307 which vested the right of action for the homicide of a child in the mother alone was repealed by Acts 1979, pp. 466, 497, (effective April 4, 1979). This repeal was incorporated in a flurry of legislative activity intended to eliminate statutory sexual discrimination in Georgia. Because the shooting and the filing of the suit occurred prior to the effective date of the 1979 act, the Court would not ordinarily be concerned with its effect. However, Section 49 of the act[6] applies its effect to "actions then pending".

Although it is inexcusably indexed in the Annotated Code under the heading "Children" and otherwise difficult to find in the annotated version of the code, the legislature did provide a substitute for the right of action for that which was repealed under former Code Section 105–1307. That right of action is granted in Section 45 of the same 1979 Act which is codified under the code title "Parent and Child" and now appears in Section 74–108 of the Georgia Code Annotated. The new right of action, in favor of "the parents," is found in Subsection (b) of Code Section 74–108.[7]

The "homicide" of a child, minor or *sui juris*, is obviously the "homicide" used and defined in Ga.Code § 105–1301. No construction of the statutes to the contrary would be reasonable. Thus, the right of action for the negligent homicide, or wrongful death, of a child is vested in the parents of the child under the laws of the State of Georgia. Mr. James M. Harden, husband of the plaintiff, Mrs. Janet L. Harden, is the father of the deceased Wesley Clayton Harden, and Mr. and Mrs. Harden are the parents in whom the right of action is vested.

This suit was filed by one plaintiff and during the course of the case prior to trial, the legislature of Georgia added a party. Mr. James M. Harden must become a party to this action because, under Fed.R. Civ.P. 19(a)(1) "in his absence complete relief cannot be accorded among those already parties . . ." No right of the Government or the plaintiff will be adversely affected by the addition of Mr. Harden to this action as a party plaintiff. Any dilution of the right of Mrs. Harden to recover for the death of her son has already occurred by act of the Georgia Legislature. Mr. James M. Harden is subject to the jurisdiction of this Court and can be made a party. The Court may order the addition of a party *sua sponte* under rule 21, Fed.R. Civ.P. See also *Gentry v. Smith*, 487 F.2d 571, at 580 (5 Cir. 1973). Mr. James M. Harden is a necessary party plaintiff to this action. However, in that he was made a party by the Court because of an act of the Georgia Legislature, it should be specifically stated that no other right of action which he may have because of his son's death will be affected or adjudicated herein. The order entered in this case will so provide.

## IV. THE COLLATERAL ESTOPPEL ISSUE

Because James M. Harden has been added as a party plaintiff in this litigation, the issue of the existence of a collateral estoppel issue must be addressed. At the trial, counsel for the Government marked and

---

**6.** Ga.Laws, 1979 Session, pp. 466–498 provides in pertinent part—"Section 49. This Act shall become effective upon its approval by the Governor or upon its becoming law without his approval and shall govern all proceedings and actions brought after it takes effect *and also all further proceedings in actions then pending*" [emphasis added].

**7.** Ga.Code § 74–108(b) provides "The parents, when not divorced, may recover for the homicide of a child, minor or sui juris, unless said child shall leave a wife, husband, or child. The parents shall be entitled to recover the full value of the life of such child. If either parent is deceased, the surviving parent shall be entitled to recover the full value of the life of such child. If the parents are divorced, the parent with custody of the child may recover for the homicide of the child. In suits for recovery, the illegitimacy of the child shall be no bar to recovery."

offered in evidence a transcript of a trial which was conducted in Columbia County Superior Court. The Court rejected the transcript and directed that it be appended to the record should counsel for the Government so desire. Although the transcript was not considered by the Court, it was argued that the doctrine of collateral estoppel prevented the plaintiffs' recovery in this case. Of course, at that time the only plaintiff was Janet L. Harden, mother of the deceased. Subsequently, the Court has added James M. Harden as a party plaintiff in this very order.

It was argued that the transcript offered presented a collateral estoppel in this case because the issues were identical, the negligence of the agent of the Government, Mr. Paul Strang, had been considered by a court of competent jurisdiction, and there was mutuality between the parties to that litigation.[8]

■ A jury returned a verdict in the Columbia County litigation but the verdict was never reduced to a judgment of the court. This fact is for reasons unknown to this District Judge. No more than the transcript of the trial was offered in evidence. No pleadings which would show the issues joined in the litigation, nor any orders explaining the lack of judgment in the case, have been offered. Thus, by argument of both the plaintiffs and the defendant, the Court can only conclude that the issues in that case were never reduced to judgment. Since no final judgment was entered in favor of or against either of the plaintiffs in this case, there is no question of any issue being res judicata.

The defendant argues that "collateral estoppel" may be distinguished from "res judicata" so long as the issues joined in this case and the preceding case are substantially identical and have been adjudicated by a court of competent jurisdiction.

The defendants' argument notwithstanding, there is no collateral estoppel to apply in this case. No judgment was entered, only a verdict. The issues may or may not have been substantially identical. The most important factor is that no final adjudication has been made since no final judgment was entered. "Collateral estoppel has variously been termed 'estoppel by record,' 'estoppel by findings,' 'estoppel by judgment,' and 'estoppel by verdict.' The latter term is not only misleading, but inaccurate, since a final judgment, rather than a verdict, is necessary for the operation for the estoppel." Moore's Federal Practice, 2nd Ed., Vol. 1b ¶ 0.441[2] at 3776.

To apply the doctrine of res judicata, there must be identical causes of action. No such requirement exists in collateral estoppel. But, each doctrine requires that the parties to the subsequent litigation be bound by prior judgment. "The essence of collateral estoppel by judgment is that some question or fact in dispute has been judicially and finally determined by a court of competent jurisdiction between the same parties or their privies." Moore, supra at 3777. Even assuming arguendo that both plaintiffs were "privies" to the former litigation, the doctrine of collateral estoppel is to no avail to the Government because there was no final adjudication or prior judgment.

Additionally, the right of action for the wrongful death of Wesley Clayton Harden, as presented in this case on behalf of both of his parents as plaintiffs, deals not only with the negligence of Mr. Paul Strang, the defendant in the former action, but also with the negligence of the defendant, the

---

8. The parties to the Columbia County lawsuit were represented by counsel to be Mr. James M. Harden, plaintiff, v. Mr. Paul Strang, defendant. Because the court did not consider the transcript or receive same in evidence, the outcome of the litigation is not known. However, because it was offered by the defendant, it is only reasonable to presume that the outcome was favorable to the Government's position. It is interesting and very important to note that *no judgment was ever entered* in the Columbia County Superior Court litigation. The case was taken to verdict only.

United States of America. There is no assertion that the negligence of the United States of America was ever raised in the preceding litigation. Thus, its direct negligence which exists in this case has never been finally adjudicated in any other action.

Accordingly, the argument and defense of collateral estoppel as raised by the defendant in this case is without merit.

### ORDER

Upon the foregoing findings of fact and conclusions of law, IT IS HEREBY ORDERED that James M. Harden is added as a party plaintiff in this case and his name shall appear upon the caption of this order and the caption of all further pleadings in this case, the judgment included.

IT IS FURTHER ORDERED that the plaintiffs, Janet L. Harden and James M. Harden, shall have and recover of the United States of America, judgment in the amount of $67,586.91, plus interest on said amount computed at a simple rate of seven per cent (7%) per annum from the date of the entry of judgment.

IT IS FURTHER ORDERED that the Clerk of this Court shall enter such judgment against the defendant and in favor of the plaintiffs forthwith.

IT IS FURTHER ORDERED that no right of action of James M. Harden, except his right to recover for the wrongful death of his son, Wesley Clayton Harden, shall be affected or adjudicated by this order or any judgment entered in this case, and any judgment shall so provide.

Exhibits to follow.

EXHIBIT A