## GIANT FOOD, INC. *v.* GERALDINE SCHERRY ET AL.

[No. 1258, September Term, 1981.]

*Decided May 7, 1982.*

The cause was argued before LISS and WILNER, JJ., and CLAYTON C. CARTER, Associate Judge of the Second Judicial Circuit, specially assigned.

*David P. Durbin,* with whom were *Robert W. Goodson* and *Carr, Jordan, Coyne & Savits* on the brief, for appellant.

*Sue Ann Mahaffey,* with whom were *Bulman, Dunie, Freeman, Burke & Feld* on the brief, for appellees.

WILNER, J., delivered the opinion of the Court.

Appellant employed William Joyner as an armed security guard to protect its store located in the Blair Plaza Shopping Center in Silver Spring. On the evening of November 11, 1978, while on duty, Joyner observed a man brandish a pistol and rob one of appellant's cashiers. He allowed the robber to leave the store, and began to pursue him across the parking lot.

As the robber reached a car parked at the far end of the lot, Joyner pulled his pistol and twice shouted to the man to stop, identifying himself as a police officer. The robber ignored the warnings, got into the car, and began to drive quickly away. Joyner, standing between fifteen and forty feet from the fleeing vehicle, fired two shots at the car.[1] One, aimed at the driver's side window, hit the rear quarter panel. The other, aimed at the rear window, sparked this litigation. Instead of hitting the car, the bullet went through Geraldine Scherry's fifth floor [2] apartment window across the street.

Ms. Scherry was just walking into her living room when the bullet shattered her window, strewing glass all over the apartment. Thinking that someone was trying to kill her, she became hysterical. The episode was so unnerving as to cause nausea, insomnia, headaches, and general mental and emotional distress, leading to the need for some psychotherapy, one hospitalization, and lost time from work.

Ms. Scherry and her husband sued appellant in the Circuit Court for Montgomery County on a variety of theories. Ultimately, the case was submitted to the jury on the theory of Joyner's negligence in firing the second shot, for which appellant would be vicariously liable, and appellant's direct negligence in hiring Joyner and entrusting him with a firearm without proper training. The jury returned a gen-

---

**1.** Joyner testified that he fired the second shot from a distance of about fifteen feet. Detective William Crieder, who investigated the incident, stated that, according to what Joyner told him at the time, Joyner "was 40 feet from the car" when he fired the second shot.

**2.** Appellant states in its brief that Ms. Scherry's apartment was on the fifth floor. We find nothing in the transcript or exhibits either to confirm or contradict that statement, but accept it as a concession.

eral verdict of $15,000 compensatory damages, $12,000 attributable to Ms. Scherry's injuries and $3,000 for loss of consortium.

In this appeal, appellant raises three issues: (1) is appellant immune from liability to appellees because Joyner had a right to use deadly force in attempting to capture the fleeing felon, (2) was the damage award based upon inadmissible expert testimony given in response to an impermissible hypothetical question, and (3) did the court err in its instructions to the jury with respect to damages? [3]

## (1) *Liability*

Appellant's theory of immunity, or non-liability, proceeds thusly: (1) as a result of his direct observations, Joyner had probable cause to arrest the fleeing felon; (2) he had the right to use reasonable force to effect that arrest, and, in the circumstances presented here, that included the use of deadly force; (3) his actions were therefore "privileged"; and (4) by reason of that "privilege," no liability would accrue to an unintended third party victim. Appellant argues this theory in two contexts: the denial of its motion for directed verdict, and the court's refusal "to instruct the jury on Restatement of Torts section 143(2) relating to the use of force and pursuit of a fleeing felon."

---

3. Appellant sets forth the Questions Presented in its appeal as follows:

"I. Can A Maryland Merchant Be Held To Have Violated Any Duty In Tort To A Remote Bystander When Its Agent Is Justified In Using Deadly Force To Arrest An Armed, Fleeing Felon And Where There Is No Evidence Provided To Define The Standard Of Care For The Training [of the] Security Officer?

II. Can A Jury Properly Decide Issues Of Privilege Or Justification Arising Out Of An Attempted Lawful Arrest Of An Armed Fleeing Felony [sic] By A Private Person Using Deadly Force Absent Instruction As To Those Issues?

III. Can A Jury Award Personal Injury Damages For Prior Medical Costs And Future Pain And Suffering Based Upon Deficient Expert Testimony As To Causation And A Lack Of Evidence As To Any Probable Future Effects?"

We find this phrasing of the issues to be somewhat slanted and misleading, and shall address the issues as rephrased.

We have no difficulty with appellant's first premise. Under Maryland law, "a private person may make an arrest if he ha[s] reasonable grounds (probable cause) to believe that a felony was committed and that the person whom he arrests committed it." *Stevenson v. State,* 287 Md. 504, 520 (1980). Certainly, in light of his own observations, Joyner had probable cause to believe that the person he was pursuing had just committed an armed robbery, and he therefore had the right and authority to arrest him.

We agree also that a person authorized to make an arrest may use reasonable or "necessary" force to accomplish that result. *The Baltimore and Ohio Railroad Company v. Strube,* 111 Md. 119, 127 (1909); Prosser, *Law of Torts,* 134 (4th Ed. 1971). We do not necessarily concur, however, with appellant's argument that the use of deadly force — the firing of shots — was justified, at least not as a matter of law. Given the fact that the robber was in the process of fleeing and, at the time, presented no immediate danger to Joyner or anyone else, and given the alternative option of noting the license tag number of the getaway car (which Joyner neglected to do) and summoning help from the police, a permissible inference could be drawn that Joyner's actions exceeded the use of reasonable or necessary force under the circumstances and therefore were not privileged. *See* Restatement of Torts (2d) § 79 (1965).

We need not rest our decision on that doubt alone, for there is a more significant weakness in appellant's argument. Joyner's conduct has to be viewed not only in the context of the duty he owed to the robber not to use excessive (*i.e.,* unreasonable, unnecessary) force in effecting an arrest, but also in terms of a duty he owed to other persons to act in a reasonable manner. A finding of "privilege" with respect to the robber does not, in other words, end the inquiry *vis a vis* any responsibility to third parties such as Ms. Scherry; it would, at best, merely serve to insulate Joyner and appellant against liability *to the robber,* had *he* been shot.

Restatement of Torts (2d) § 137 (1965), states that "[l]iability for the invasion of any of another's interests of

personalty, by the exercise of the privilege of effecting the arrest or recapture, or of maintaining custody of a third person, is determined by the rules stated in §§ 74 and 75 [of the Restatement]." Section 75, which deals with the situation of one acting in self-defense, provides:

> "An act which is privileged for the purpose of protecting the actor from a harmful or offensive contact or other invasion of his interests of personalty subjects the actor to liability to a third person for any harm unintentionally done to him *only if the actor realizes or should realize that his act creates an unreasonable risk of causing such harm.*" (Emphasis supplied.)

*See also* §§ 83 and 111, expressing the same principle in the context of acting in defense of property and in the recaption of chattels.

These sections of the Restatement make clear that, in attempting to make a warrantless arrest, a person has, in effect, a double responsibility — one to the prospective arrestee not to use unnecessary force against him, and one to the public at large to use even reasonable force in a reasonable manner. This is illustrated in Comment c to § 137, which states, in relevant part:

> "Thus, if an actor is privileged to shoot at an escaping felon, he is not liable to a third person harmed by a stray bullet, *if when he shot there was little or no probability that any person other than the felon would be hit.* But when he shoots into a crowded thoroughfare, and unintentionally hits a passerby, his act is unprivileged if, in view of the surrounding conditions, including the nature of the crime for which he seeks to arrest, recapture, or maintain custody, the harm which may ensue if he does not act, and his skill or lack of skill in the use of the weapon, it is unreasonable for him to take the chance of causing grave harm to bystanders." (Emphasis supplied.)

In light of the case law that has developed, we think that the reference in the second sentence of Comment c to shooting into a crowded thoroughfare is merely one of example, not one of limitation. The reasonableness standard set forth in §§ 75, 83, and 111, incorporated by reference into § 137, and otherwise explicated in Comment c, would apply whether the shot is fired into a "crowded thoroughfare" or any other place or circumstance in which there is some prospect that an innocent person may be hurt.

These kinds of situations, in which an innocent bystander is injured or killed in the course of an attempt to apprehend a criminal or defend an attack on one's person or property, arise in a variety of contexts — some more life-threatening to the actor than others, some involving felons and felonies, others involving misdemeanants and misdemeanors. The context is important in determining the reasonableness of the action taken, but the basic standard seems to be the same. Where the evidence shows that the actor, whether a police officer or a private citizen, acted without due regard to the danger caused to innocent third parties, he (and his employer) have been held liable. *See, for example, Robledo v. City of Los Angeles,* 252 C.A.2d 285 (1967); *Goodrich v. Morgan,* 291 S.W.2d 610 (Tenn.App. 1956); *Heidbreder v. Northampton Township Trustees,* 411 N.E.2d 825 (Ohio App. 1979); *Meistinsky v. City of New York,* 140 N.Y.S.2d 212 (A.D. 1955), *aff'd* 309 N.Y. 998 (1956); *Wilkes v. City of New York,* 124 N.E.2d 338 (N.Y. 1954); *Harden v. United States,* 485 F.Supp. 380 (S.D.Ga. 1980); *Davis v. McKey,* 167 So.2d 416 (La.App.), *writ refused* 168 So.2d 822, 823 (La. 1964); *Dyson v. Schmidt,* 109 N.W.2d 262 (Minn. 1961); *Davis v. Hellwig,* 122 A.2d 497 (N.J. 1956); *Cerri v. United States,* 80 F.Supp. 831 (N.D.Cal. 1948); *Young v. Kelley,* 21 N.E.2d 602 (Ohio App. 1938); *Day v. Walton,* 281 S.W.2d 685 (Tenn. 1955); *Edgin v. Talley,* 276 S.W. 591 (Ark. 1925); Greenstone, *Liability of Police Officers for Misuse of Their Weapons,* 16 Clev.-Mar. L. Rev. 397, 405 (1967); Note, *The Civil Liability of Peace Officers For Wounding or Killing,* 28 Cinc. L. Rev. 488, 495 (1959).

Conversely, where the evidence establishes that the defendant acted reasonably, liability has been denied. *See Hatfield v. Gracen,* 567 P.2d 546 (Or. 1977); *Graham v. Ogden,* 157 So.2d 365 (La.App. 1963); *Gordon v. City of New Orleans,* 363 So.2d 235 (La. App. 1978), aff'd 371 So.2d 768 (La. 1979); *and compare Everette v. City of New Kensington,* 396 A.2d 467 (Pa.Super. 1978), where the court divided equally.

The question, then, is whether, under all of the circumstances in which Mr. Joyner found himself at the moment he took the second shot, it was reasonable for him to have fired that shot. Was there a prospect of injuring someone else?

In *Fowler v. Smith,* 240 Md. 240, 246 (1965), the Court of Appeals, in an oft-quoted passage, stated:

> "Negligence is a relative term and must be decided upon the facts of each particular case. Ordinarily it is a question of fact to be determined by the jury, and before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn. ... *And Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, legally sufficient as tending to prove negligence, and the weight and value of such evidence will be left to the jury.*" (Emphasis supplied.)

Against this standard, we find no error in the court's refusal to grant either the motion for directed verdict or the instruction "on Restatement of Torts section 143 (2) . . . ."

Mr. Joyner described the episode thusly:

> "As soon as he [the robber] set foot on the parking lot he got into a slight trot across the parking lot. At

this time I had already unbuckled my holster, and I jumped up and followed suit. I unholstered my revolver.

I was running to the parking lot, and I called for the subject to halt, 'police officer'. He looked around and kept trotting.

I am still in pursuit as he reached the car. I noticed that he did not have an accomplice, and he reached in the car, he reached down into his inside coat and pulled his revolver back and brandished it up in the air like this. (Witness indicating.) He did it as if he was going to turn and fire. He did not fire.

He put his weapon back in his pants, stuck it back down in his pants and got in the car. This is when I hollered for him to halt again. At this time the subject got in the car and proceeded to pull off, and I fired my first shot which hit the rear panel of the car.

He was pulling off in kind of a hurry. He burned a lot of rubber on the parking lot getting off the parking lot. I fired another shot at the back window of the car."

Earlier, he had stated:

"Q The robber never pointed his gun at you at any time during this chase, is that correct?

A No, he didn't point at me — at me directly.

Q He didn't point it directly at anybody else in the area, is that correct?

A No."

In subsequent testimony, Joyner confirmed that the robber "put his weapon back in his belt *before he got in the car.*" (Emphasis supplied.)

Montgomery County police personnel arrived at the scene "[a] couple seconds" after the shooting incident, according to Joyner. From the description given by him, the suspect was arrested the next day.

From that evidence, permissible inferences arise that (1) the fleeing robber posed no imminent danger to Joyner or anyone else; (2) Joyner could have assisted in recovering his employer's property and effecting the robber's arrest simply by noting his description and the license tag number of the "getaway" car and summoning the more mobile county police; and (3) Joyner was literally shooting into the dark at a rapidly moving target.[4] From the fact that his first shot, aimed at the driver's window, hit the rear quarter panel, a fair inference arises that Joyner's aim was not the best, and that he should have realized that to be the case. Finally, from other evidence in the record, a further inference arises that Joyner should have been aware that he was shooting in the general direction of the apartment complex in which Ms. Scherry resided and that, if he missed his intended target (or the bullet ricocheted off of it), the bullet might strike someone therein.

These inferences are clearly ones of negligence. From them, a trier of fact could rationally conclude that Joyner did not act reasonably, that he should have realized he was creating an unreasonable risk of harm to innocent bystanders by taking that second shot. The issue, then, was one for the jury.

With respect to the instruction, the record reveals that it was merely a recitation of Restatement of Torts (2d) § 143 (2), which has no relevance whatever to this case.

Section 143 deals with the force which a person is authorized to use to *prevent* the commission or consummation of a felony. Subsection (2), and the requested instruction, provides:

"The use of force or the imposition of a confinement intended or likely to cause death or serious bodily harm is privileged if the actor reasonably believes that the commission or consummation of the felony cannot otherwise be prevented and the felony for

---

4. The episode occurred at about 7:30 p.m. on November 11. Joyner stated that "it was dark that time of the year, but the parking lot was light."

the prevention of which the actor is intervening is of a type threatening death or serious bodily harm or involving the breaking and entry of a dwelling place."

There was no evidence to support such an instruction. Joyner did not fire his gun to prevent a felony, but to apprehend the felon. There was, at the time, no threat of death or serious bodily harm (except from Joyner), and the felony in question did not involve the breaking and entry of a dwelling place. Most important, even if the privilege mentioned in the instruction were applicable, for the reasons stated above it would not preclude liability to appellees.[5]

Because we believe that the case was properly submitted to the jury on the issue of Joyner's negligence, for which appellant would be vicariously responsible, and in light of the general verdict returned by the jury (there being no request by appellant for submission of the case on issues), it is not necessary for us to consider whether the evidence sufficed to sustain the verdict on the alternative basis of negligent employment and entrustment.

## (2) *Hypothetical Question*

Ms. Scherry testified as to certain physical and emotional trauma suffered by her following the shooting incident — headaches, insomnia, fear of automobiles, nervousness, etc. Dr. Nathan Billig, a psychiatrist who treated Ms. Scherry after the incident, was asked by means of a hypothetical question whether he could relate those various symptoms to

---

5. We need not consider whether appellant would have been entitled to an instruction along the line of § 137, as such an instruction was not requested. The court gave general instructions on the law of negligence, and specifically told the jury that it was to consider

"whether his actions in shooting at the subject under the existing circumstances was reasonable; whether his conduct was such as to produce an unreasonable risk of harm to members of the public in the vicinity, and whether Mr. Joyner realized, or should have realized in the exercise of reasonable care that his action might be dangerous to persons on adjoining property."

That is the essence of § 137.

the shooting. Over a general objection, he said that he could, and that he did.

Appellant complains here that the hypothetical question was improper because it omitted certain "facts" that appellant now thinks were relevant. We believe the question included all that it had to, and was proper.

### (3) *Jury Instructions*

In its charge to the jury, the court stated:

"In assessing the damages on the part of the individual plaintiff, Geraldine Scherry, the Court instructs you you should consider the following: The personal injuries that she has sustained, and the nature, and extent and duration of those injuries, the effect that the injuries had on her overall physical and mental health, and her well-being, the mental anguish and nervous shock suffered in the past, and with reasonable probability may be expected to be experience[d] in the future, the medical and other expenses that she has reasonably incurred, and the value of the loss of earnings that she incurred as a result of these injuries."

Appellant complains that the instruction relating to "permanence" — the injuries Ms. Scherry "with reasonable probability may be expected to ... experience in the future" — was improper because there was no evidence to support it. We disagree. There was testimony from Ms. Scherry, from her husband, and from two treating psychotherapists that *some* of her symptoms were still present at time of trial, and were of a chronic nature.

> *Judgment affirmed; appellant to pay the costs.*