Michael WELSH, a minor, By and Through his mother and next friend, Kathleen WELSH, et al., Plaintiffs,

v.

CENTURY PRODUCTS, INC., Defendant.

Civ. A. No. R–86–192.

United States District Court, D. Maryland.

Aug. 16, 1990.

Robert A. Rohrbaugh, Rockville, Md., for plaintiffs.

Louis G. Close, Deborah Sweet, Whiteford, Taylor & Preston, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

RAMSEY, District Judge.

Pending before the Court in the above-captioned case is the motion of defendant Century Products, Inc. ("Century"), for partial summary judgment.[1] The motion has been fully briefed and the Court is now prepared to rule without need for a hearing. Local Rule 105.6 (D.Md.1989). For the reasons set forth below, the motion will be denied.

### I. Background

On January 26, 1983, a station wagon driven by Patrick Welsh was struck by a van driven by James Voigt, II. Michael Welsh, Patrick and Kathleen Welshes' two-and-one-half year old son, was riding in the back seat of the station wagon at the time of the accident in a "Century 200" child car seat. Just prior to the accident, at least one—perhaps both—of the shoulder straps of the child seat had slipped off of Michael's shoulders. As a result, when the vehicles impacted Michael was thrown from the car seat. He sustained serious physical injuries, including permanent brain damage.

The Welshes initially filed a state court action against Voigt, alleging that his negligence caused the accident. On June 18, 1985, the Welshes and Voigt announced to the state court that they had reached a settlement, which was finalized over a year later on July 26, 1986. In the meantime, on January 21, 1986, the Welshes filed the instant action against Gerber, Century, and Sears (collectively "Century"), alleging that the injuries sustained by Michael were caused by defects in the car seat. The amended complaint sets forth eleven counts alleging negligence, strict liability in tort, and breach of express and implied warranties. Currently pending is Century's motion for summary judgment on the negligent design and negligent failure to instruct counts, Amended Complaint Counts I, II, VII, and VIII.[2]

In short, Century contends that the Welshes' state common law negligent design and instruction counts are preempted by the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, operating through the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. §§ 1381–1431 (West 1982 & Supp.1990) ("Safety Act") and Federal Motor Vehicle Safety Standard 213, 49 C.F.R. § 571.213 (1989) ("FMVSS 213"). In particular, Century claims that 15 U.S.C. § 1392(d) preempts the Welshes'

---

**1.** When filed, the motion was joined by Gerber Products, Inc. ("Gerber"), Century's parent corporation. By Order dated August 8, 1990, the Court granted Gerber's motion for summary judgment, thereby removing Gerber from this case. Thus, the pending motion is pressed now only by the remaining defendants, Century and Sears Roebuck & Company ("Sears").

**2.** The motion identifies the Counts as I, II, V, and VI. The discrepancy results from the fact that the Welshes' filed an amended complaint on the same day that Century filed its motion for partial summary judgment; in the amended complaint, the relevant counts are renumbered. In addition, the Court notes that a typographical error exists on page 17 of the amended complaint: what is intended to read "COUNT VIII" reads "COUNT III." The Court will refer to this count as Count VIII.

state tort causes of action. Section 1392(d) reads, in pertinent part:

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

FMVSS 213, which "specifies requirements for child restraint systems used in motor vehicles," 49 C.F.R. § 571.213.S1, was promulgated pursuant to the Safety Act and governs the design of child car seat and the instructions accompanying the seats. Since no dispute exists regarding the Century 200 car seat's conformity with the minimum requirements established by FMVSS 213, Century contends that it is entitled to summary judgment on the common law counts.

The Welshes assert that the Safety Act was not intended to preempt common law tort claims. For support, they chiefly rely on the "savings clause" of the Safety Act, 15 U.S.C. § 1397(k).[3] This section, entitled "Continuation of common law liability," provides: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." Thus, the Welshes' conclude that Congress' intent to preserve rather than preempt common law tort actions is clearly expressed in the statute.

With this statutory and regulatory framework in mind, the Court will turn to Century's motion. The Court will first address the issue of preemption and then consider whether the Welshes have assembled sufficient evidence of negligent design and instruction to survive Century's motion.

## II. Preemption

### A. Preemption Principles

As the Supreme Court recently observed, the three general "circumstances in which federal law pre-empts state law are familiar." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). First, the federal statute may, by its terms, explicitly preempt state law. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95–96, 103 S.Ct. 2890, 2898–99, 77 L.Ed.2d 490 (1983). Second, the federal statute may implicitly preempt state law by so pervasively regulating a given subject matter that an "intent to occupy [the] ... field to the exclusion of state law" is apparent. *Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1150. *See also Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Third, the federal statute may implicitly preempt state law if the state law "actually conflicts" with the federal law. *Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1150. "Such a conflict will be found ' "when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)." ' *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581, 107 S.Ct. 1419, 1425, 94 L.Ed.2d 577 (1987), quoting *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984)." *Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1151. Regardless of the type of preemption analysis applied, the intent of Congress in enacting the federal statute is the starting point. *Fidelity Savings & Loan Assn. v. de la Cuesta*, 458 U.S. 141, 152–154, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982).

---

**3.** Both parties cite this provision as 15 U.S.C. § 1397(c). However, effective January 31, 1990, former § 1397(c) was redesignated as § 1397(k) by the "Imported Vehicle Safety Compliance Act of 1988," Pub.L. 100–562, § 2(b), 102 Stat. 2818. The text of the provision was unchanged.

## B. Express Preemption

 Century first contends that the § 1392(d) of the Safety Act explicitly preempts state common law tort suits centered on alleged deficiencies in child car seat design or instruction. It argues that state law negligence standards, like state statutes or regulations, create a safety standard. *See Cox v. Baltimore County*, 646 F.Supp. 761, 763 (D.Md.1986) ("A rule of the common law which permits the recovery of monetary damages for its breach self-evidently sets a standard...."). Since the Welshes seek to hold Century liable for negligence when Century has fully complied with FMVSS 213, Century contends that the state common law rule is "not identical" to the federal standard and, therefore, preempted. Moreover, Century contends that the savings clause presented in § 1397(k) cannot be read to preserve the Welshes' cause of action. Again, Century points to *Cox*, in which Judge Motz reasoned that "the clear meaning of the clause is that compliance with the federal standards does not protect an automobile manufacturer from liability for design or manufacturing defects in connection with matters not covered by the federal standard." *Cox*, 646 F.Supp. at 764.

For a number of reasons, the Court disagrees with Century and concludes that the Safety Act does not expressly preempt the Welshes' common law causes of action. Initially, the Court notes that *Cox* concerned FMVSS 208, 49 C.F.R. § 571.208 (1989), the much-litigated "air bag" regulation. *See Motor Vehicles Mfrs. Assn. v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). As will be discussed in greater detail below, *see infra* pp. 320–21, the preemptive effect of the Safety Act in conjunction with FMVSS 208 is not dispositive of the issue before the Court; indeed, given the unique nature of the statutory and regulatory scheme surrounding the air bag regulation, the numerous cases addressing the issue of preemption in that context are not even particularly helpful here.[4]

Turning to the merits of the express preemption claim, the Court begins "by recognizing that a strong presumption exists against finding express preemption when the subject matter, such as the provision of tort remedies to compensate for personal injuries, is one that has traditionally been regarded as properly within the scope of the states' rights." *Taylor*, 875 F.2d at 823. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981). Absent a "clear and manifest" expression of Congress' intent to override state common law, express preemption does not exist. *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152. This principle is bolstered, moreover, by the enduring maxim that statutes in derogation of the common law are to be narrowly construed. *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30, 35–36, 104 S.Ct. 304, 307–08, 78 L.Ed.2d 29 (1983) ("It is a well-established principle of statutory construction that '[t]he common law ... ought not be deemed to be

---

**4.** Several courts have found that the Safety Act and FMVSS 208 explicitly preempts state common law tort actions: *See Heftel v. General Motors Corp.*, 1988 WL 19615, No. 85–1713, slip op. (D.D.C. Feb. 23, 1988); *Cox, supra; Vanover v. Ford Motor Co.*, 632 F.Supp. 1095, 1096 (E.D. Mo.1986). Many others have found state common law tort actions implicitly preempted: *See Taylor v. General Motors Corp.*, 875 F.2d 816 (11th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Wood v. General Motors Corp.*, 865 F.2d 395 (1st Cir. 1989), *cert. denied*, — U.S. —, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990); *Pokorny v. Ford Motor Co.*, 714 F.Supp. 739 (E.D.Pa.1989), *aff'd in relevant part*, 902 F.2d 1116 (3rd Cir.1990); *Kolbeck v. General Motors Corp.*, 702 F.Supp. 532 (E.D. Pa.1988); *Staggs v. Chrysler Corp.*, 678 F.Supp.

270 (N.D.Ga.1987); *Schick v. Chrysler Corp.*, 675 F.Supp. 1183 (D.S.D.1987); *Baird v. General Motors Corp.*, 654 F.Supp. 28 (N.D.Ohio 1986). On the other hand, several courts have found that state common law causes of action are not preempted. *See Richart v. Ford Motor Co.*, 681 F.Supp. 1462 (D.N.M.1988), *rev'd by Kitts v. General Motors Corp.*, 875 F.2d 787 (10th Cir. 1989), *cert. denied*, — U.S. —, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Garrett v. Ford Motor Co.*, 684 F.Supp. 407 (D.Md.1987); *Wood v. General Motors Corp.*, 673 F.Supp. 1108 (D.Mass. 1987), *rev'd*, 865 F.2d 395 (1st Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990); *Gingold v. Audi–NSU–Auto Union, A.G.*, 389 Pa.Super. 328, 567 A.2d 312 (1989).

repealed, unless the language of a statute be clear and explicit for this purpose.' *Fairfax's Devisee v. Hunter's Lessee,* 7 Cranch 603, 623, 3 L.Ed. 453 (1813).''). *See also Badaracco v. Commissioner,* 464 U.S. 386, 403 n. 3, 104 S.Ct. 756, 767 n. 3, 78 L.Ed.2d 549 (1984) (Stevens, J., dissenting). Common law tort remedies designed to compensate a victim for personal injuries are "a subject matter of the kind [the] Court has traditionally regarded as properly within the scope of state superintendence." *Florida Lime & Avocado Growers,* 373 U.S. at 144, 83 S.Ct. at 1218.

The plain language of the Safety Act compels the conclusion that state common law is not explicitly preempted. Section 1397(k) could hardly be clearer: it states that compliance with a duly promulgated FMVSS *does not* immunize a manufacturer from common law liability. Moreover, reading § 1397(k) as only being applicable to those situations where no safety standard has been promulgated, as Century and the court in *Cox* suggest, would render § 1397(k) a mere redundancy. By its terms, § 1392(d) only purports to preempt state standards governing "the same aspect of performance" as a FMVSS; if no FMVSS exists on the subject, then no preemption could possibly occur. Since every portion of a statute should, if possible, be given effect, *see United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955), and given the presumption against concluding that a federal statute explicitly preempts state common law, the Court is compelled to reject Century's contention.

This conclusion is reinforced by two additional considerations. First, a review of the United States Code reveals that Congress is perfectly capable of expressly preempting common law actions when it desires to do so. *See* Domestic Housing and International Recovery and Financial Stability Act, 12 U.S.C. §§ 1715z–17(d) & 18(e) (West 1989) (preempting any "State constitution, statute, court decree, common law, rule, or public policy"); Copyright Act of 1976, 17 U.S.C. § 301(a) (West 1977) (preempting rights "under the common law or statutes of any State"); Employee Re-

tirement Income Security Act of 1974, 29 U.S.C. § 1144(a) (West 1985) (preempting all state "laws, decisions, rules, regulations, or other State action having the effect of law"). The fact that Congress chose not to include a sweeping preemption provision in the Safety Act counsels against a finding of explicit preemption. *See Taylor,* 875 F.2d at 824. *Cf. Cipollone v. Liggett Group, Inc.,* 789 F.2d 181, 185–86 (3d Cir.1986) (holding that absence of explicit reference to state common law in preemption section of Cigarette Labelling and Advertising Act indicated no express intent to preempt common law cause of action), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987); *Ferebee v. Chevron Chem. Co.,* 736 F.2d 1529, 1542–43 (D.C.Cir.) (same reasoning applied to Federal Insecticide, Fungicide, and Rodenticide Act), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

Second, although the Court does not believe resort to the legislative history is necessary since the language of § 1397(k) is clear in itself, *see Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984), a review of the legislative history of the Safety Act also reveals that Congress did not intend to expressly preempt state common law. The Senate Report which accompanied the Bill states that "[t]he federal minimum safety standards need not be interpreted as restricting state common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law." S.Rep. No. 1301, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin.News 2709, 2720. The House Report fully concurred. It states that "[Congress] intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law, particularly those related to ... tort liability." H.R.Rep. No. 1776, 89th Cong., 2d Sess. 24 (1966).

Thus, the Court finds that the Safety Act and FMVSS 213 do not expressly preempt

the Welshes' common law negligence counts.

## C. Implied Preemption

■ Century also contends that the Safety Act and FMVSS 213 implicitly preempt the Welshes' common law tort claims. The purposes of the Safety Act, Century argues, would be frustrated if common law standards of care were permitted to dictate a vehicle equipment manufacturer's behavior. Thus, Century concludes that third type of preemption—where the state law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, 61 S.Ct. at 404—applies.[5]

The Safety Act was enacted in 1966 to achieve one overriding objective: to counteract the "soaring rate of death and debilitation on the Nation's highways." S.Rep. No. 1301, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin.News 2709, 2709. This purpose is reflected in the opening section of the Safety Act, in which "Congress ... declares that the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents. Therefore, Congress determines that it is necessary to establish motor vehicle safety standards for motor vehicles and equipment in interstate commerce." 15 U.S.C. § 1381. *See* 15 U.S.C. § 1391(2) (" 'Motor vehicle safety standards' means a minimum standard for motor vehicle ... equipment performance"); 15 U.S.C. § 1392(a) ("The Secretary shall establish by order appropriate Federal motor vehicle safety standards.").[6]

The primacy of Congress' concern with enhancing safety on the highways is reflected as well in the various reports that accompanied the Safety Act during its journey through Congress. The Senate Report states "that safety shall be the overriding consideration in the issuance of standards under this bill." S.Rep. No. 1301, 89th

Cong., 2d Sess., *reprinted in* 1966 U.S. Code Cong. & Admin.News 2709, 2714. The Conference Committee Report accompanying the final version of the Bill out of the Senate echoes this point. It described the Safety Act as intending "to provide for a coordinated national safety program and establishment of safety standards for motor vehicles in interstate commerce to reduce accidents involving motor vehicles and to reduce the deaths and injuries occurring in such accidents...." Conf.Rep. No. 1919, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin.News 2731, 2731. Thus, it would seem that a common law standard of care that itself promoted safety would be fully consistent with the Safety Act and FMVSS 213, not an obstacle to the achievement of Congress' purposes.

Century, while recognizing that Congress' preeminent intent was to enhance safety, contends that " 'the legislative history of the Act makes clear that a significant subsidiary purpose—itself intended to promote the primary goal—was to create uniform motor vehicle standards.' " Memorandum in Support of Motion for Partial Summary Judgment at 5, citing *Cox*, 646 F.Supp. at 764. If a common law negligence suit were permitted to proceed, with the possibility that Century could be held liable despite the fact that it complied with the applicable FMVSS, the goal of nationwide uniformity in safety regulation would be undermined. As Judge Motz reasoned in *Cox*, the purpose of promoting uniformity "would be entirely frustrated by permitting individual states to adopt tort rules which would permit liability to be imposed upon manufacturers because of the absence of airbags." *Cox*, 646 F.Supp. 764.

Century's argument is unpersuasive for two reasons. First, the structure of the Safety Act and its legislative history discloses no independent purpose to achieve nationwide uniformity in regulation at the expense of common law causes of action.

---

**5.** Century does not contend that Congress intended to occupy the entire field of motor vehicle safety by enacting the Safety Act. Thus, Century makes no argument that common law negligence actions are preempted on that ground. *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152.

**6.** In this spirit, FMVSS 213 declares that "[t]he purpose of this standard is to reduce the number of children killed or injured in motor vehicle crashes...." 49 C.F.R. § 571.213.S2.

The preemption clause of the Safety Act, § 1392(d), itself contemplates, in some instances, differing state regulation of motor vehicle safety. If, for instance, no FMVSS has been promulgated, then state established standards are fully effective. *See, e.g., Chrysler Corp. v. Rhodes,* 416 F.2d 319 (1st Cir.1968). And even if an FMVSS on a particular subject exists, a state regulatory scheme that is deemed "identical" to the Federal safety standard may co-exist with the FMVSS. *See, e.g., Sims v. Florida Dep't of Highway Safety & Motor Vehicles,* 862 F.2d 1449, 1455–58 (11th Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). The legislative history also reveals no intent to promote uniformity *per se.* The Senate Commerce Committee Report contains the following passage concerning uniformity: "The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country." While this passage seems to indicate that Congress is seeking to foster uniformity *per se,* it does not stand alone. Rather, it is immediately followed by the these comments:

> At the same time, the committee believes that the States should be free to adopt standards identical to the Federal standards ... so that the States may play a significant role in the vehicle safety field.... [T]he federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law.

S.Rep. No. 1301, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin. News 2709, 2720. What this passage reveals—especially when viewed in context of the express declaration of Congress' purpose in § 1381, the structure of § 1392(d), and the bulk of the legislative history—is that uniformity in regulation is a goal of the Safety Act only insofar as it promotes safety. Uniformity is not a goal in and of itself; nor is uniformity a goal of the Safety Act so that vehicle equipment manufacturers might avoid tort liability. As Judge Howard aptly observed, "Congress intended the Act to save the lives of automobile passengers through safety standards[,] not the dollars of automobile manufacturers through uniformity." *Garrett,* 684 F.Supp. at 409.

Century's position is unpersuasive for a second reason: Common law tort standards of care do not constitute "safety standard[s]" within the meaning of § 1392(d) and thus are not preempted by that section. As a practical matter, of course, it is clear that the imposition of liability for violating a standard of care influences the choices that a manufacturer makes. Such a result, after all, is the underlying premise of tort law. Nevertheless, influencing a manufacturer's decision is not equivalent to compelling a manufacturer's decision. Regulation, whether by a legislature or by an administrative agency delegated the task, is designed to compel certain actions; it imposes a legal obligation on the manufacturer to change a products' characteristics. In the context of Federal safety standards for automobiles, the manufacturer must be able to demonstrate that its product satisfies the minimum requirements set forth in the FMVSS; otherwise, its product cannot be sold. A finding of liability in tort, in contrast, does nothing to prevent the product from being sold. It is simply a cost of doing business. *See Richart,* 681 F.Supp. at 1467.

This distinction between regulation and tort liability has been recognized in a number of contexts. In *Ferebee v. Chevron, supra,* the court let stand a jury verdict (applying Maryland law) finding Chevron strictly liable in tort for the inadequate warning labels on its herbicide paraquat. Ferebee, an agricultural worker, alleged that he contracted pulmonary fibrosis as a result of long-term skin exposure to the chemical. Chevron appealed, arguing *inter alia* that Ferebee's common law cause of action was barred by the preemptive language of the labelling provision of the Federal Insecticide, Fungicide, and Rodenticide

Act ("FIFRA"). That provision, much like § 1392(d), provides that a state "shall not impose or continue in effect any requirements for labelling ... in addition to or different from those required under this subchapter." 7 U.S.C. § 136v(b) (West 1980). There was no dispute that Chevron had complied with the applicable federal regulations regarding labelling. Thus, it "argue[d] that a damage action based on the inadequacy of a label has a regulatory aim—to assure that adequate labels are used—and that is precisely this regulatory aim that FIFRA explicitly preempts." *Id.*, 736 F.2d at 1540. The court rejected this contention. It held

> The verdict itself does not command Chevron to alter its label—the verdict merely tells Chevron that, if it chooses to continue selling paraquat in Maryland, it may have to compensate for some of the resulting injuries. That may in some sense impose a burden on the sale of paraquat in Maryland, but it is not equivalent to a direct regulatory command that Chevron change its label. Chevron can comply with both federal and state law by continuing to use the EPA-approved label and by simultaneously paying damages to successful tort plaintiffs such as Mr. Ferebee.

*Id.* at 1541.

Justice Blackmun's comments in his dissent in *Silkwood v. Kerr–McGee, supra,* also support the distinction drawn between federal regulation and state common law compensation. In *Silkwood,* the Court majority held that the Atomic Energy Act and the regulations promulgated by the Nuclear Regulatory Commission ("NRC") pursuant to that Act did not preempt Silkwood's claim for punitive damages. The Court rejected Kerr–McGee's argument that a punitive damage award is tantamount to a direct regulation of safety, an issue committed solely to the authority of the NRC. *Id.,* 464 U.S. at 256, 104 S.Ct. at 625–26. Justice Blackmun, joined by Justice Marshall, dissented, agreeing with Kerr–McGee that punitive damages were the effective equivalent of safety regulation by the state and thus preempted by the Act and the NRC regulations. In making his argument, Justice Blackmun drew a distinction between punitive damage awards and compensatory damage awards, finding that compensatory damages—unlike punitive damages—were not the equivalent of state regulation.

> It is to be noted that the same pre-emption analysis produces the opposite conclusion when applied to an award of compensatory damages. It is true that the prospect of compensating victims of nuclear accidents will affect a licensee's safety calculus. Compensatory damages therefore have an indirect impact on daily operations of a nuclear facility.... *The crucial distinction between compensatory and punitive damages is that the purpose of punitive damages is to regulate safety, whereas the purpose of compensatory damages is to compensate victims.* Because the Federal Government does not regulate the compensation of victims, and because it is inconceivable that Congress intended to leave victims with no remedy at all, the pre-emption analysis established by *Pacific Gas [& Elec. Co. v. State Energy Resources Conservation & Development Co.,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)] comfortably accommodates—indeed it compels—the conclusion that compensatory damages are not pre-empted whereas punitive damages are.

*Id.* at 263–64, 104 S.Ct. at 629 (emphasis added). Justice Blackmun also noted that "whatever compensation standard a State imposes, whether it be negligence or strict liability, a licensee remains free to continue operating under federal standards and to pay for the injury that results." *Id.* at 264, 104 S.Ct. at 629.

Justice Blackmun's analysis, along with the D.C. Circuit's holding in *Ferebee,* lend support to this Court's conclusion that common law standards of behavior do not constitute impermissible state safety regulation within the meaning of § 1392(d). While the imposition of monetary damages upon Century for the injuries sustained by Michael Welsh most likely would influence Century's behavior, the Court does not believe that such influence conflicts in any measurable way with the purposes of the Safety Act of FMVSS 213. Accordingly,

the Court holds that the Welshes causes of action are not impliedly preempted.

Finally, a word is in order concerning the numerous cases in which courts have found common law actions preempted by the Safety Act in conjunction with FMVSS 208 (the "air bag" regulation). *See supra* note 4. Two factors, which are particularly pertinent to the courts' analyses in the air bag cases, are not relevant here. The absence of these two factors makes this case clearly distinguishable from the air bag cases.

First, FMVSS 208 is an unusual regulation. Unlike the child safety seat regulation at issue here, FMVSS 208 offers automobile manufacturers three options for achieving the requisite degree of "occupant crash protection." The manufacturer may choose "complete passive protection," including the use of an air bag, 49 C.F.R. §§ 571.208.S4.1.1.1; or the manufacturer may choose a "lap belt protection system with belt warning," 49 C.F.R. §§ 571.208.-S4.1.1.2; or the manufacturer may choose a "lap and shoulder belt protection system with belt warning," 49 C.F.R. §§ 571.208.-S4.1.1.3. As many courts have recognized, imposing tort liability on a manufacturer because it selects to install seat belts rather than air bags would have the effect of taking the federally-mandated choice of options away from the manufacturer. *See, e.g., Taylor,* 875 F.2d at 816 ("a state common law rule that would, in effect, remove the element of choice authorized in [FMVSS] 208 would frustrate the federal regulatory scheme"); *Kolbeck,* 702 F.Supp. at 502 ("The prospect of common law damage awards for failing to chose [sic] the passive restraint alternatives removes the element of choice expressly authorized by FMVSS 208...."); *Baird,* 654 F.Supp. at 32. On that basis, these courts have held that common law tort actions are preempted by the Safety Act and FMVSS 208. Since FMVSS 213 does not permit a manufacturer to choose among options, however, no similar limitation on a manufacturer's lawful range of options would occur if common law tort liability were imposed on Cen-

tury here. In other words, the "persuasion" resulting from a finding of liability in an air bag case would work directly to limit a manufacturer's choice of options; the persuasion resulting from a finding of liability in this case would not similarly limit Century's options.

Second, in 1974 Congress enacted the Motor Vehicle and Schoolbus Safety Amendments, a statute directed solely at the issue of air bags. Codified at 15 U.S.C. § 1410b (West 1982), this legislation imposed a legislative veto provision on any amendment to FMVSS 208 that required the installation of air bags. 15 U.S.C. § 1410b(d).[7] By doing so, Congress expressed its clear intent to carefully scrutinize any regulation having the effect of requiring the use of air bags. Recognizing this purpose, many courts have held that permitting the use of air bags to be effectively mandated through common law tort suits would frustrate the intent of § 1410b. *See, e.g., Kolbeck,* 702 F.Supp. at 541; *Cox,* 646 F.Supp. at 764; *Baird,* 654 F.Supp. at 32. No similar Congressional intent to scrutinize safety regulations of child car seats exists. Thus, the special factor present in the air bag cases of legislation directly on point does not factor into the case at bar.

In sum, the Court finds that the Welshes common law tort actions are neither expressly nor impliedly preempted by the Safety Act and FMVSS. In so holding, the Court concurs with the court in *Larsen v. General Motors Corp.,* 391 F.2d 495, 506 (8th Cir.1968), which held, in one of the earliest reported circuit court decisions after the enactment of the Safety Act, that

[the] Safety Act is intended to be supplementary of and in addition to the common law of negligence and product liability. The common law is not sterile or rigid and serves the best interests of society by adapting standards of conduct and responsibility that fairly meet the emerging and developing needs of our

---

**7.** Of course, the continuing validity of the legislative veto provision is in serious doubt in the aftermath of *Immigration and Naturalization*

*Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

time. The common law standard of a duty to use reasonable care in light of all the circumstances can at least serve the needs of our society until the legislature imposes higher standards or the courts expand the doctrine of strict liability for tort. The Act is a salutary step in this direction and not an exemption from common law liability.

This holding, of course, does not mean that Century's compliance with FMVSS 213 is irrelevant to this litigation. Indeed, it may constitute very strong evidence of due care and may be received in evidence for that purpose. Nevertheless, compliance with FMVSS 213 does not preempt the Welshes' common law negligence claims.

### III. Summary Judgment

#### A. General Standards

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure serves the important purpose of "conserv[ing] judicial time and energy by avoiding unnecessary trial and by providing a speedy and efficient summary disposition" of litigation in which the plaintiff fails to make some minimal showing that the defendant may be liable on the claims alleged. *Bland v. Norfolk & S.R.*, 406 F.2d 863, 866 (4th Cir. 1969).

The applicable standards for analyzing a motion for summary judgment under Rule 56 are well-established. The defendant seeking summary judgment bears the burden of showing the absence of any genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In determining if the defendant has met this burden, the Court must consider whether, when assessing the evidence in the light most favorable to the plaintiff, a "fair-minded jury could return a verdict for the plaintiff...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Pulliam Inv. Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987). Nevertheless, the "mere existence of a scintilla of evidence in support of

the plaintiff's position will be insufficient" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. *See also Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984). The plaintiff must identify for the Court some dispute of fact that is material to the legal issues presented in the case in order to successfully oppose a motion for summary judgment. "The plain language of Rule 56(b) mandates the entry of summary judgment, after an adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. It is against these standards that the Court shall review Century's motion.

#### B. Analysis

■ Century contends that the Welshes have failed to satisfy their burden of coming forward with evidence of negligent design and negligently inadequate instructions. With regard to negligent design (Counts I and VII), Century notes that Kathleen Welsh testified in her deposition that, after the accident in which Michael was injured, the Welshes continued to use the car seat. Century contends that this continued use of car seat, along with the undisputed fact that the car seat complied with FMVSS 213, compels the conclusion that the product was not negligently designed. *See Tauber v. Nissan Motor Corp., USA*, 671 F.Supp. 1070 (D.Md.1987). The Welshes' expert, however, has testified that, in his opinion, the design of the child car seat was defective in that it failed to adequately secure the shoulder straps in "real world" situations. The testing performed by Century prior to putting the Century 200 seat on the market, although it complied with FMVSS 213, failed to account for the realities of use of the product, including squirming children. This failure, the expert opined, is evidence of a lack of due care.

Given the expert testimony, and given the fact that compliance with an applicable FMVSS is not wholly dispositive, *see Stone-*

*hocker v. General Motors Corp.*, 587 F.2d 151, 155–57 (4th Cir.1978), the Court cannot conclude that no issue of material fact exists regarding Century's alleged negligent design. Unlike the plaintiff in *Tauber*, the Welshes have presented expert testimony that the product at issue is defective. *Compare Tauber*, 671 F.Supp. at 1074 ("Plaintiff's expert has not provided any credible basis for characterizing the seat as defective in the general context of motor vehicle accidents."). Thus, the Welshes have presented evidence that rises above "mere proof of an accident," *id.*, and accordingly defeat Century's motion as to Counts I and VII.

■ With regard to the allegedly inadequate instructions (Counts II and VIII), Century asserts that the Welshes' expert has offered no opinion whatsoever on the issue. In the absence of such an opinion, Century contends that the Welshes have failed to carry their burden under *Celotex* and *Liberty Lobby*. Century's assertion, however, is not supported by the record. At his deposition, plaintiff's expert, after testifying that he believed that Century had in its possession information regarding the potential failure of the shoulder straps to secure a child, offered the following opinion:

> Century ... knew and should have disseminated information and cautions to the customer that the clip should have been added—first of all, it should have been provided, with a notice, to the retailers to provide with the sale of the seats to the customers, and that instruction should have been supplemented to the restraint, as manufactured. ...

Deposition of John Harcourt, p. 123, appended to Plaintiffs' Opposition to the Motion for Partial Summary Judgment. The deposition transcript also reveals the following exchange:

> Q: Are you saying that, in your opinion, Century had an obligation to provide information concerning the harness clip and the harness clip, itself, directly to Mr. and Mrs. Welsh?
>
> A: Through its agents, yes.

*Id.* at 126. Thus, the Welshes have presented an issue of material fact regarding the adequacy of the instructions accompanying the child car seat. Counts II and VIII, therefore, survive Century's motion.

Since on the present state of the record the Court cannot conclude that no genuine issues of material fact exist on the several negligence counts, and since the Maryland courts have repeatedly emphasized that negligence ordinarily involves questions of fact that must be decided by a jury upon all the evidence, *see Giant Food, Inc. v. Scherry*, 51 Md.App. 586, 592, 444 A.2d 483 (1982), the Court will deny Century's motion for partial summary judgment.

Accordingly, it is this 16th day of August, 1990, by the United States District Court for the District of Maryland,

ORDERED:

That defendants' motion for partial summary judgment is DENIED.